364 So.2d 908 (1978)
STATE of Louisiana
v.
Charles THOMPSON.
No. 61735.
Supreme Court of Louisiana.
November 13, 1978.
*909 Nesib Nader, Shreveport, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John A. Richardson, Dist. Atty., B. Woodrow Nesbitt, Jr., Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
SUMMERS, Justice.
By an indictment returned on February 15, 1977 the Grand Jury of Caddo Parish charged that on January 5, 1977 Charles Thompson committed aggravated rape upon a nine-year-old girl. La.Rev.Stat. 14:42. In a jury trial in November 1977, Thompson was found guilty as charged. After a sentencing hearing the jury recommended that Thompson be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. Whereupon, the trial judge sentenced Thompson accordingly.
All assignments of error briefed and argued on Thompson's appeal are considered in this decision.
The victim testified that on the morning of January 5, 1977, while she was walking to the bus stop on her way to school, the defendant grabbed her and forced her into a nearby house on Douglas Street where he had sexual intercourse with her. Eyewitnesses confirmed the abduction.
Assignment 1: In its case in chief the State sought to establish that Reginal Wilson, a child of eight, had sufficient understanding *910 to be a witness. After examination by the prosecutor, the trial judge and defense counsel, objection was made by defense counsel to any testimony from the child because of his age, his hesitation, and his inability to respond to questions. Argument was that the events in question occurred too long ago to expect such a young child to remember. And defense counsel felt that because of the nature of the case, a child's testimony should not be received.
The trial judge did not agree. It was his opinion that the responses to the questions and the level of the child's understanding were sufficient to permit him to testify.
Without the benefit of observing his demeanor on the stand on this appeal, a reading of the transcript pertaining to the examination of the child confirms the correctness of the ruling of the trial judge. Reginal's subsequent testimony also supports a finding that he had sufficient understanding to testify as a witness. There is no indication that his answers to questions were hesitant. Nor does the written transcript support the defense claim that the child was unable to respond to questions. To the contrary, the transcript indicates that he was alert, forthright and accurate in his replies. He was in the third grade at the time of the trial. His responses to questions concerning his name and address, the school he attended, his mother's name and his brother's age all manifest the clarity of his expression and reliability of his recall. He knew what it meant to lie, he attended Sunday School at times, believed in God and understood that God wanted him to tell the truth. And, apparently, there was no evidence of confusion in the taking of the oath.
Section 469 of Title 15 of the Revised Statutes sets the standard to be observed when a child is called upon to testify:
"Understanding, and not age, must determine whether any person tendered as a witness shall be sworn; but no child less than twelve years of age shall, over the objection either of the district attorney or of the defendant, be sworn as a witness, until the court is satisfied, after examination, that such child has sufficient understanding to be a witness."
An important consideration in the determination of a child's competency to testify is his demeanor on the witness stand. In this respect the judgment of the trial judge should be given great weight, for the effect of the importance of witnesses' manner where children are testifying cannot be overstated. It is a factor this record does not supply. Nothing in this record leads us to believe that the trial judge erred in finding Reginal qualified as a witness.
In State v. Francis, 337 So.2d 487 (La. 1976), criteria were suggested which could be applied in deciding whether a child has the "sufficient understanding" required by Section 469. These criteria were substantially complied with in this case. Decisions of this Court support a finding that this assignment has no merit. State v. Noble, 342 So.2d 170 (La.1977); State v. Sharp, 338 So.2d 654 (La.1976); State v. Johansen, 332 So.2d 270 (La.1976); State v. Pace, 301 So.2d 323 (La.1974); State v. Milford, 225 La. 611, 73 So.2d 778 (1954).
Assignment 2: After Shirley Cogas was qualified as an expert criminalist, particularly in the field of serology, she testified for the State. During direct examination two glass slides with the name of the victim and the date January 5, 1976 (corrected to January 5, 1977) written thereon, were presented to the witness. She testified that she had examined the slides and found microscopically that there was spermatozoa present and she also determined that they contained seminal fluid.
She was then asked by the prosecutor, "The presence of spermatozoa would indicate what in a case involving an alleged rape?"
In reply, she stated, "Well, spermatozoa would indicate specifically that there was seminal fluid there, that there was that type of body secretion."
A defense objection was then made that the witness could not testify that a rape had occurred in this case. The objection was overruled.
*911 Initially it should be noted that the question had been answered when the objection was made. Notwithstanding the trial judge's inability to rule on a question already answered, the question propounded and the answer that followed simply meant that the witness found seminal fluid and that seminal fluid is present in a sex act. The testimony does not mean, as defense counsel claims, that the expert witness was testifying that a rape had occurred. Previously the witness had testified that the presence of seminal fluid on undergarments would indicate that a sexual act had occurred. Thereafter her testimony was qualified. She testified that the presence of seminal fluid on the undergarments indicated that a sex act had occurred, but she could not say that it was completed. She did not say, and we are convinced that the jury did not understand from her testimony, that a rape had occurred.
It was undoubtedly within the expertise of the witness to testify, as she did, that the presence of seminal fluid was associated with a sex act. Such a conclusion is a matter of common knowledge. La.Rev. Stat. 15:466. There is, therefore, no merit to this assignment.
Assignment 4: Emma Lee Manigo was living in Shreveport with appellant Thompson prior to and during January 1977 when the alleged rape occurred. The child victim lived with her at times. She testified for the defense that about 8 o'clock on the morning of January 5, 1977 she was awakened by her mother and told that the child had been raped. She dressed and went in search of Thompson. First she went to the house of a friend of Thompson; then she called Thompson's mother who told her where Thompson could be found. With this information she proceeded to the Castle Hotel on Sprague Street. At first the desk clerk refused to tell her if he was there, but when she told the clerk what she wanted to see Thompson about he telephoned Thompson's room. When Manigo stated that Thompson came down the stairs in the hotel, defense counsel asked her, "Did you talk to him?"
She answered,
"Well, I was hollering at him, `Charles, did you do it?' And he said, `What you talking about?' And I just kept hollering at him. That's all I could do, and we got down the street across the street on the other side of Douglas and that's when the police arrested both of us."
Defense counsel then asked,
"He never did answer you?"
Before Manigo could reply, the State's attorney objected and requested that the witness be instructed not to say what Thompson said to her, arguing that it would be impermissible hearsay testimony.
The trial judge sustained the objection, unless the answer was to be a declaration against interest, an exception to the hearsay rule. He required that defense counsel lay a foundation to this testimony which would remove it from the hearsay rule.
The defense contends that the answer Thompson would give was part of the res gestae and as such admissible as an exception to the hearsay rule. The contention is without merit. "To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction." La.Rev.Stat. 15:448. See also La. Rev.Stat. 15:447.[1]
It is a tenuous argument indeed to take the position that Thompson's statement to Manigo at the hotel was made "under the immediate pressure of the occurrence through the instructive, impulsive and spontaneous words and acts of the participants." Nor were his statements at the hotel "necessary incidents of the criminal act, or immediate concomitants of it," nor did they *912 "form in conjunction with it one continuous transaction."
Elapsed time between the alleged rape and the intended statement was appreciable. After the assault the child walked to her grandmother's house and told her what had happened. The grandmother then reported the matter to Manigo, who dressed and went in search of Thompson. Her search consumed considerable time  a call at the house of Thompson's friend, a telephone call to Thompson's mother, and then a trip to the hotel and a conversation with the clerk  all before Thompson appeared to talk to her, hardly a conversation forming a necessary incident of the criminal act, or part of a continuous transaction.
However broadly the rule of res gestae may have been applied in the past, in no instance cited has it been as liberally applied as the defense urges in the instant case. La.Rev.Stat. 15:447-48; State v. Drew, 360 So.2d 500 (La.1978); State v. Williams, 331 So.2d 467 (La.1976).
Subsequently, Thompson took the stand in his own behalf and testified that as they left the hotel Manigo asked him if he had raped the child, to which he replied, "What?" Thus, the statement to which the State objected did in fact get to the jury thereby rending the ruling of the judge moot.
Assignments 7, 9 and 10: Thompson testified in his own behalf. At the time of the trial, he was incarcerated in the State Penitentiary at Angola. He was asked on direct examination where he lived "prior to your having been sentenced in a previous conviction?" He testified that at the time of the alleged offense on January 5, 1977, he was out of jail on bond on account of a pending criminal charge against him.
This interrogation by defense counsel also took place:
"Q. Mr. Thompson, we're not going to conceal anything from the jury. I want to know if you have ever been convicted before?
A. Yeah. Yes, sir. I've been convicted before.
Q. Where and for what?
A. I been convicted for burglary.
Q. Was it simple burglary?
A. Simple burglary.
Q. Have you ever been convicted of any assault on any female?
A. I've never been convicted for hurting or attacking anyone.
Q. Are there any other crimes? Robbery?
A. No. Never no robbery.
Q. What about homicide?
A. No. Never. None of that."
On cross-examination the prosecutor questioned Thompson to some extent concerning the details of the burglary. To a considerable degree, a large portion of the details of the crime were volunteered by Thompson and were beyond the scope of the questions propounded by the State's attorney. He exhibited no reluctance in his attempt to minimize the seriousness of the offense. Finally, defense counsel objected to inquiry into the details of past convictions. In overruling the objection the trial judge announced to the jury:
"I will remind the jury, and I will so instruct you at the conclusion of the case, that the nature of this offense that is under inquiry . . . [the burglary] by the state is only to be considered in testing the credibility of this witness and is not to be used in determining the guilt or innocence of the defendant."
Interrogation relating to the burglary was brief thereafter. Thompson then admitted that he had previously been convicted of theft, two separate charges of receiving stolen goods and simple escape. Cross-examination continued, over defense objection, eliciting the details of these crimes also.
To support its position that the trial judge erroneously allowed the prosecutor to question defendant concerning the details of the crimes for which defendant had been convicted, defense counsel relies upon Section 495 of Title 15 of the Revised Statutes:
"Evidence of conviction of crime, but not of arrest, indictment or prosecution, *913 is admissible for the purpose of impeaching the credibility of the witness, but before evidence of such former conviction can be adduced from any other source than the witness whose credibility is to be impeached, he must have been questioned on cross-examination as to such conviction, and have failed distinctly to admit the same; and no witness, whether he be defendant or not, can be asked on cross-examination whether or not he has ever been indicted or arrested, and can only be questioned as to conviction, and as provided herein."
A line of decisions by this Court has held that the prosecutor may cross-examine a defendant on the circumstances surrounding the crime forming the basis of a prior conviction. The extent to which this inquiry can be permitted is dependent upon the facts of the particular case. State v. Whitmore, 353 So.2d 1286 (La.1978); State v. Dupar, 353 So.2d 272 (La.1977); State v. Chenier, 343 So.2d 177 (La.1977); State v. Williams, 339 So.2d 728 (La.1976); State v. Elam, 312 So.2d 318 (La.1975); State v. Jackson, 307 So.2d 604 (La.1975).
As articulated in State v. Jackson, supra, the basis of the rule for admitting details of convictions to test the credibility of the defendant lies in a recognition of the fact that it is not the conviction which impeaches, but the unlawful act. The conviction only simplifies proof. And, theoretically, evidence of the character of the crime is evidence of past conduct of a witness and is generally admissible, for it may be relevant to the determination of his credibility by the jury. It is only because of policy considerations that evidence of prior misconduct of the witness is inadmissible.
These policy considerations are based on problems arising from presentation of the evidence rather than the nature of the evidence itself. These involve the amount of new evidence generated by the production of additional testimony upon minor points by additional witnesses. Each additional witness introduces the entire group of questions as to his qualifications and his impeachment, etc., so that the trial may become in length extremely protracted, and with relatively little profit. In addition, the mass of testimony on minor points tends to overwhelm the essential issues of the case and to confuse the tribunal in its efforts to disentangle the truth upon those material points. Another consideration is the unfairness of surprise which arises from the proof of prior misconduct when there is no possible way of anticipating the nature of false evidence which could be refuted. Ibid.
None of these objections could be assigned to the case before us. While the prosecutor's questioning pertaining to the circumstances surrounding the convictions did occur, it was neither lengthy nor protracted in time. Nor did it result in creating a mass of new evidence from a number of additional witnesses, who were in turn subjected to impeachment.
Because the crime for which he was being prosecuted was so grave, it is unlikely that details of the convictions of simple burglary, two charges of receiving stolen goods, and simple escape prejudiced Thompson's cause. To the contrary, the details disclosed by the cross-examination only served to militate the seriousness of the offenses in Thompson's favor by permitting him to point out that these prior convictions did not involve aggravating circumstances. Otherwise, if only proof of the convictions was permitted, the jury would be free to infer that the crimes were grave, a danger of prejudice to the defendant. His ready replies and detailed explanations and descriptions of the circumstances surrounding the prior offenses created an impression which was favorable to Thompson. For instance, while admitting the burglary, Thompson was able to place before the jury the fact that he did not break and enter, having entered the structure through an opening previously made by someone else; the stolen goods he received were five tape deck tapes, not things of great value; and the escape for which he pled guilty only involved a twenty-four hour absence from jail. In addition, the admonition of the trial judge further tended to limit the adverse *914 effect of the evidence of the circumstances surrounding the prior convictions.
When all things are considered the cross-examination of Thompson on the details of his previous convictions did not help the State's case.
Assignment 8: While Thompson was under cross-examination by the prosecutor, he was asked on two occasions whether he wanted to return to the penitentiary. The second time defense counsel objected that the question was repetitious and the trial judge instructed the prosecutor to desist.
In brief on this appeal defense counsel argues that the questioning did not seek to elicit relevant testimony.
This assignment is without merit. The trial judge sustained the objection by instructing the prosecutor to move on to another subject. In addition the question sought to elicit a response which was obvious to the jury  Thompson did not want to return to the penitentiary. And finally, the trial objection that the question was repetitious can not be converted into an argument couched in terms of relevancy on appeal.
Assignment 11: A young boy, Reginal Wilson, about eight years old, testified that he saw Thompson "drag" the victim into the house on Douglas Street where she said she was raped. In his testimony Thompson denied his involvement in the rape, or that he was present in the vicinity at the time. On cross-examination the prosecutor asked, "So today you're saying that this little boy is mistaken or he's a liar." The question was answered without objection.
Thompson was also asked whether Andrew Smith, an elderly man who saw Thompson and the victim emerge from the house where the rape is alleged to have occurred, was mistaken about his testimony and what he saw. This question was also answered without objection. In further cross-examination Thompson was asked if George Smith, the desk clerk, was mistaken when he testified concerning Thompson's departures from the hotel. He answered without objection. And the victim's grandmother's testimony was that the child came to her crying and the child had "white stuff" between her legs shortly after the time of the alleged rape. Thompson was asked on cross-examination if she too was incorrect. This too was answered. When Thompson was asked if the Coroner was incorrect when he testified that the little girl had been subjected to a traumatic sexual intercourse, defense counsel objected that the prosecutor was asking Thompson for an opinion on what the Coroner said.
Although only the last question was objected to, defense counsel assigns error to the questioning of all of these witnesses. It is contended that the questions, involving accusations of incorrectness and mistakes, are prejudicial and impermissible because they are crude efforts at cross-examination which should not be encouraged. This contention is without merit. The questions are neither crude nor impermissible. They were simply an effort on the part of the prosecutor to clarify the defendant's position relative to his contradictory testimony on the facts.
As to the objection that defendant could not be called upon to give an opinion on the correctness of the Coroner's testimony, that, too, is not a well-founded contention. The answer did not require an opinion, only a statement of the impression Thompson gained from the Coroner's testimony. Having taken the stand he was subject to cross-examination on his phase of the case. The question was relevant and permissible. This assignment is without merit.
For the reasons assigned, the conviction and sentence are affirmed.
TATE, J., concurs and assigns reasons.
DIXON and CALOGERO, JJ., concur.
DENNIS, Justice, dissenting.
The holding approving of cross-examination of a witness on the details of a prior conviction disregards R.S. 15:495.
*915 TATE, Justice, concurring.
Assignment 11 represents impermissible cross-examination of a witness by asking him to express his opinion of the credibility of an opposing witness. This court has repeatedly disapproved of this type of cross-examination as improperly argumentative. See, e. g., State v. Duke, 358 So.2d 293 (La.1978) and cases therein cited. While I doubt that the error is reversible in the present case, the majority opinion incorrectly condones this improper practice  which may eventually require reversal to effectuate our repeated prohibitions against its use.
With regard to Assignments 7, 9, and 10, I once again note my disagreement with State v. Jackson, 307 So.2d 604 (La.1975) and its progeny. However, until Jackson et al. are overruled (as eventually they must be), the trial court was not in error in permitting such cross-examination.
NOTES
[1] La.Rev.Stat. 15:447:

"Res gestae are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events. What forms any part of the res gestae is always admissible in evidence."