377 So.2d 289 (1979)
STATE of Louisiana
v.
Vincent GAUTREAUX
No. 64494.
Supreme Court of Louisiana.
November 1, 1979.
Rehearing Denied December 13, 1979.
Peter C. Piccione, Sr., Peter C. Piccione Law Offices, Lafayette, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Ross A. Brupbacher, Asst. Dist. Atty., for plaintiff-appellee.
DENNIS, Justice.
Defendant appeals from a second degree murder conviction and a sentence of life imprisonment without benefit of parole, probation or suspension of sentence for forty years, contending that the trial court committed reversible error by permitting *290 the state to introduce an inculpatory statement without advising the defendant before trial of its intention to use the statement in evidence as required by La.C.Cr.P. art. 768. We affirm the defendant's conviction and sentence. The inculpatory statement was wrongfully introduced because the state failed to give the defendant pretrial notice and the statement was not admissible as part of the res gestae. Nevertheless, under the particular circumstances of this case, the introduction of the inculpatory statement was harmless error.
The defendant, Vincent Gautreaux, and his friends, Rickey Landry, Tim Darby and Terry Hargrave, all young white men, visited Rome's Amusement Center in Lafayette Parish on the afternoon of March 2, 1978. The defendant and his friends had been drinking alcoholic beverages and smoking marijuana since noon that day. A short time after they arrived at the amusement center, two young black men came in. Rickey Landry ordered one of the black youths to take his bottle of beer outside. Shortly thereafter, Landry hit the black youth. A fight ensued, resulting in the fatal stabbing of one of the young blacks, Charles Alfred.
Chad Romero, the seventeen year old son of the amusement center proprietor, and Mark Glynn, a fourteen year old youth, testified that they were eyewitnesses to the stabbing. When the fight started both Chad and Mark were inside the amusement center. They followed as Gautreaux, Darby and Landry chased Charles Alfred into the back yard of the amusement center and fatally wounded him with a knife. They testified that Gautreaux was the first to stab Alfred as he was being held by Darby and Landry. Chad testified that the other two men then took turns stabbing Alfred. Mark testified that only Landry wielded the knife after Gautreaux struck the first blow.
Terry Hargrave, one of Gautreaux's companions, testified that before the black youths arrived, Gautreaux had gotten into an argument with the proprietor of the amusement center and was spoiling for a fight. When Gautreaux saw the young blacks approaching the amusement center he said, "A nigger will do." Rickey Landry joined in at once and announced that he was "going to kill a nigger." As the fight erupted and progressed, Hargrave stood back and watched the victim run outside and toward the back of the building, followed by Darby, Landry and then Gautreaux. Although Hargrave testified that he later saw Gautreaux in front of the building, he did not know whether the defendant had gone into the back yard prior to his appearance in front. Hargrave never saw a knife in Gautreaux's possession. However, he saw Darby with a knife during the fight and saw Landry cleaning his nails with a small knife after the fight.
Gautreaux's testimony disagreed with that of the other witnesses in many important respects. In his version of the incident, he did not argue with the proprietor, he did not join in chasing the victim, and he did not go into the back yard of the amusement center. Instead, he maintained that he walked outside and remained in front of the center while Darby was fighting with Alfred in the back yard. Gautreaux denied stabbing Alfred or saying that he had killed anyone.
After Hargrave related the events of the fight, the prosecuting attorney asked him if Gautreaux made an inculpatory statement after the fight. The defense attorney objected on the ground that the state had not advised him that the statement would be introduced as required by Article 768 of the Code of Criminal Procedure. The prosecution argued that a notice was not required since Gautreaux's statement was part of the res gestae. A hearing was held out of the presence of the jury to determine the circumstances under which the statement occurred.
While the jury was excused, Hargrave testified that after the fight, Gautreaux, Landry and Darby left with him in his car, after lingering at the amusement center for three to four minutes. They then drove toward Gautreaux's house but stopped at a Shamrock gasoline station about one and one half to two miles from the amusement *291 center to buy gas or talk to a friend. They resumed their journey in a few minutes, however, and as they continued toward their destination the combatants began to laugh and talk as they recounted the fight. According to Hargrave, Tim Darby said that he had "finally killed a nigger;" and Gautreaux then said, "I finally killed a nigger," too. This statement could have occurred, according to Hargrave's various estimates, anywhere between the Shamrock gas station and Gautreaux's house, which would place it in time somewhere between approximately ten and thirty minutes after the killing.
The trial judge ruled that the inculpatory statement was part of the res gestae and therefore admissible despite the prosecution's failure to give a pretrial notice. Over the defense attorney's objection, the prosecution was allowed to elicit from Hargrave his recollection of Gautreaux's incriminating statement in the presence of the jury.
Since it is undisputed that the utterance was an inculpatory statement, and that the state failed to advise the defendant of its intention to introduce the statement prior to trial, the issues are: (1) Was the statement a part of the res gestae and (2) if the statement was improperly admitted into evidence, did the error substantially affect Gautreaux's rights?
The inculpatory statement was not admissible because it was not part of the res gestae. What forms any part of the res gestae is always admissible in evidence. La.R.S. 15:447. However, the res gestae is restricted to events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and does not encompass the words of the participants when narrating the events. Id. Furthermore, to constitute res gestae, the circumstances and declarations must be necessary incidents to the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction. La.R.S. 15:448. Gautreaux's words were spoken approximately ten to thirty minutes after the stabbing, when the defendant had rejoined a non-participating friend and others and had left the scene, had stopped at a gas station, and was nearly home. His statement did not occur under the immediate pressure of the stabbing but during a laughter-filled post mortem of the fight by the participants. Gautreaux's statement clearly was not a necessary incident of the criminal act, an immediate concomitant of it, or a declaration which formed in conjunction with it one continuance transaction.
Under the circumstances peculiar to this case, however, we conclude that Gautreaux's rights were not substantially prejudiced by introduction of the statement and that the error was harmless. The evidence pointing to Gautreaux's guilt was overwhelming. The testimony of the two young boys who said they saw Gautreaux inflict the first knife wound and hold Alfred while he was stabbed repeatedly was not seriously controverted. Gautreaux's contrary testimony was not persuasive because it was in hopeless conflict with that of the other witnesses on several major points. The racial hatred attributed to Gautreaux by his inculpatory statement was not significantly prejudicial because his animosity for black people had already been revealed to the jury, without objection, by the introduction of his statements and actions which preceded the killing. Furthermore, the introduction of the inculpatory statement made in Hargrave's presence created little, if any, additional prejudice over that caused by the introduction of another inculpatory statement made by Gautreaux in the presence of a police officer. Under these circumstances, we are convinced beyond a reasonable doubt that the inculpatory statement, by itself or in combination with other evidence, worked no substantial prejudice on the accused's rights.
None of the remaining assignments presents reversible error. Our discussion of them does not establish new rules of law, alter or modify an existing rule, involve a legal issue of continuing public interest, or criticize existing law. Therefore, our disposition of the balance of defendant's assignments *292 of error will be set forth in an unpublished, but publicly recorded, appendix to this opinion.
The defendant's conviction and sentence are affirmed.
AFFIRMED.
MARCUS, J., concurs and assigns reasons.
TATE, J., dissents and assigns reasons.
CALOGERO, J., dissents for reasons assigned by TATE, J.
MARCUS, Justice (concurring).
While I have serious reservations that the failure of the state to give defendant notice of its intention to introduce his inculpatory statement in evidence as required by La. Code Crim.P. art. 768 is not a substantial violation of a statutory right requiring reversal (La.Code Crim.P. art. 921), I concur in the result because I consider the statement admissible as part of the res gestae.
The statement by defendant, "I finally killed a nigger," was admitted during the testimony of Terry P. Hargrave. Hargrave testified that he was at Rome's Amusement Center with Landry, Darby, defendant and two others on the day of the murder. Landry, Darby and defendant had come to the center with the witness. Defendant started an argument with the owner of the establishment and indicated that he wanted to fight his son. At that point, two black fellows arrived. Defendant stated that, "A nigger will do." Landry said: "I'm going to kill a nigger." Thereafter, a fight started in front of the center involving the two blacks, Landry, Darby and defendant. Hargrave was not involved; however, he testified that he saw Darby fighting with the victim (Charles Alfred); Darby had a knife and the victim had a cane. The victim ran to the rear of the building followed by Landry, Darby and defendant. Hargrave remained in front. He claims that he made no attempt to see what was going on in the back yard except initially he saw Landry on the ground. Shortly thereafter (about five minutes), Landry, Darby and defendant came to the front and the three departed with Hargrave in the latter's car. The witness estimated that they left about three or four minutes after the fight was over. They proceeded to defendant's home which took about twenty to twenty-five minutes. On the way, they stopped at a gas station. Prior to reaching the gas station, Landry described that he had "hooked" one of the blacks when the fighting started. After leaving the gas station, defendant stated: "I finally killed a nigger." Hargrave estimated that this statement was made by defendant about fifteen to twenty minutes after they had left Rome's.
La.R.S. 15:448 provides:
To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
In the instant case, while Hargrave did not actually participate in the fight, he was with the participants and observed what took place throughout except for the five-minute period when the fight moved to the back yard at which time he waited in front. Immediately after the fight, they all departed in Hargrave's car. The statement was made by defendant to the other participants in the stabbing incident during their flight from the scene of the crime.
First, it should be observed that defendant's statement would have been admissible in evidence as an exception to the hearsay rule either as part of the res gestae or as a declaration against penal interest. However, the issue presented is whether the statement was within the res gestae so as not to require notice under art. 768. Under the circumstances, I consider, as did the trial judge, that the statement was within the res gestae and thus did not require notice under art. 768.
Accordingly, I concur in the affirmance of the conviction and sentence.
*293 TATE, Justice, dissenting.
The defendant was either directly (according to almost all other witnesses) or peripherally (according to his own testimony) involved in a senseless and inexcusable killing, stemming entirely from racial prejudice. He nevertheless is entitled to the enforcement of a statutory right designed to inform him fairly and in advance of trial of any incriminating statements he made subsequent to the offense.
Article 768, La.Code of Criminal Procedure, requires that the state must advise the defendant in advance of trial when it intends to introduce any inculpatory statement he made. The statute also provides that, if the state "fails to do so a confession or inculpatory statement shall not be admissible in evidence." The purpose of the pretrial notice is to afford the defendant a fair opportunity to plan and present his defense in the light of this extremely damaging type of evidence which might be offered against him. State v. Sneed, 316 So.2d 372 (La.1975).
The state deliberately violated this article in the present case, apparently under a tenuous theory that no notice was required because the statement was res gestae. It did give notice that it would introduce another inculpatory statement made by the accused to police officers. It did not give notice of this extremely damaging additional statement made by the accused to a friend and companion (who did not participate in the stabbing) some 20-25 minutes after the incident, after they had left the scene, stopped for gas, and were on the way to the accused's home.
Over defense objection based on the lack of notice, the prosecutor developed that the defendant told his companions, "I finally killed a nigger," referring to the stabbing of the victim some 20-25 minutes earlier. This incriminating statement was all the more surprising to the defense, since the witness had failed to tell defense counsel of it when interviewed earlier that day and had, in fact, neglected to mention it to the investigating police officers at the time of the incident. (They had therefore failed to note it in their investigation reports of the incident.)
Until the witness testified at the trial to this extremely damaging admission, the defendant had no way of obtaining any notice that there would be a claim that he had made such a statement. The very purpose of Article 768 is to afford the defendant pre-trial notice that damaging testimony of this nature might be introduced, so as to afford him an opportunity to counter it if untrue, and so as to permit him to plan his defense, for instance by preparation for cross-examination as to the credibility of the witness.
I am sympathetic to the majority's effort to avoid reversal, for the reasons of harmless error enunciated by its opinion. Nevertheless, to permit the admission of this damaging incriminatory statement without the statutorily required pre-trial notice is to fly in the teeth of the express statutory prohibition of Article 768 and of the fair-trial notice requirements of this statute.
With respect therefore, I must dissent.