433 So.2d 73 (1983)
STATE of Louisiana
v.
Reinier NESLO.
No. 81-KA-1202.
Supreme Court of Louisiana.
May 23, 1983.
*75 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry Connick, Dist. Atty., John Craft, Jeff Bassett, Lindsey Larson, Asst. Dist. Attys., for plaintiff-appellee.
Numa Burtel, John Lawrence, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
The defendant, Reinier Neslo, was indicted by the Orleans Parish Grand Jury with the first degree murder of Suzanne M. Theriot in the early morning hours of April 11, 1980. At trial in December, 1980, following two days of testimony, the twelve person jury returned a unanimous verdict of guilty. After the sentencing hearing, the jury was unable to agree on the death sentence and the defendant was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. Defendant has appealed his conviction arguing fourteen of seventeen assignments of error.
John Finney, a first year student at Louisiana State University Medical School, went to Nick's Bar on Thursday, April 10, 1980 after taking a test at school. About midnight he was joined by Suzanne Theriot and Joli Scalise, both students at the Louisiana State University School of Nursing. After about an hour, the three decided to go to Pat O'Brien's in the French Quarter. They parked their car on Conti Street between Burgundy and Dauphine and walked the several blocks to Pat O'Brien's. After a drink there, the three went around the corner to another bar on Toulouse Street where they stayed for a couple of hours. *76 About 4:00 a.m. they were ready to go home and began the walk back to their car.
On the night of April 10, 1980 Edward Johnson was drinking in Latraina's Lounge on Freret Street. He was joined by Reinier Neslo about midnight and the two later went to Mason's in Neslo's brown Ford Fairmont. The pair drank there for several hours and then went to the French Quarter with Johnson driving and Neslo in the passenger seat. According to Johnson, "we were flirting with some people all over the quarter, being friendly, riding around. Things of that nature."
As Finney, Theriot and Scalise were walking back to the car, they were passed by Neslo and Johnson who shouted to them to ask if they were lost and needed a ride. Finney told them that they were fine, so they drove on. The car circled the block and passed them again, repeating the offer, which was again declined. The three continued to walk in search of their parked car.
Again Neslo and Johnson returned; the car backed up to the curb. The passenger, Neslo, alighted, opening the front and rear doors on the passenger side. Finney noticed Neslo was carrying a silver gun with a light brown handle at his side. Neslo took Theriot's hand and pulled her toward the car. Finney pulled back. Neslo raised the gun to Finney's face. Finney backed up several steps and Neslo pulled the trigger, hitting Finney in the mouth.
Scalise ran up toward Theriot and Neslo. Neslo grabbed her and pushed her into the back seat. He continued to struggle with Theriot with Scalise inside the car. The back door was slammed shut. Theriot broke loose and began running, turning her head to look back. Neslo shot her in the face, and she fell to the ground immediately. Neslo stared at her for several seconds and then reentered the front seat of the car. As he did, Scalise escaped from the back seat and ran around the corner. The car sped away, Neslo taking a last shot at Finney, missing over his ducked head.
Police arrived on the scene almost immediately, having been attracted by the gunfire. The victims were taken to the hospital where Suzanne Theriot died after surgery. John Finney spent six days in the hospital after surgery to remove the bullet lodged in his jawbone.
Assignment of Error No. 1
In this assignment of error, the defendant contends the trial court erred in denying his motion for a change of venue. The ruling on the motion was reserved until after the jury selection was completed in order that the court could assess the juror responses. Attached to the motion were photocopies of newspaper articles which appeared at the time of the crime and arrest of the defendant in April and May of 1980. The trial was held in December of 1980.
C.Cr.P. 622 provides the grounds for granting a motion for a change of venue:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
The burden of proof is on the defendant to show that such prejudice exists in the community that a fair trial is impossible. State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Adams, 394 So.2d 1204 (La.1981); State v. Williams, 385 So.2d 214 (La.1980), cert. denied, 449 U.S. 1017, 101 S.Ct. 580, 66 L.Ed.2d 478 (1980).
In denying the motion the trial judge stated:
"Well, I have no difficulty whatsoever in denying this motion, particularly in view of the response of the jurors on voir dire in two questions posed by defense counsel as to whether or not they will be influenced by any possible newspaper accounts that they've read. I am awestruck and must confess, somewhat pleased, for future *77 reference in the administration of justice, at how few of the prospective jurors answered in the affirmative that they read anything in the paper or recalled anything even if they had read it. I was particularly interested in the fact that one of the jurors who said that they had read it, accounts of this alleged murder, replied that they were not too much impressed and seemed to convey the impression to this Court that, in this, cases are not tried before the press, but in the courtroom. I found not the slightest scintilla of evidence that would uphold moving this case to another jurisdiction for trial...." (Emphasis added).
In brief, counsel for the defendant relies primarily on the quantity of the news coverage. No example of any prejudice is brought to the attention of this court. The trial judge's reasons for denying the motion indicate that such prejudice was, in fact, nonexistent.
This assignment of error lacks merit.
Assignment of Error No. 2
In this assignment of error, defendant contends that the trial court erred in denying his motion to suppress identification. The defendant argues that the procedure used was unduly suggestive and that there was not an independent basis for the identification.
At the hearing on the motion to suppress identification, Detective Martin Venezia testified that a few days after the murder had taken place, he assembled a stack of approximately twenty-five photographs which he showed to John Finney and Joli Scalise separately. Neither made any identification of anyone in the photographs, but they did each pick out several photographs depicting characteristics similar to those of the defendant  this one's nose, that one's hair. These photographs were turned over to the police artist to help in making a sketch.
By April 21st Reinier Neslo had become a suspect in the case. Venezia assembled an array of seven photographs including Neslo and others resembling him. That evening he presented the photographs to Scalise by laying them face up on a table in her apartment. She selected two photographs: Neslo and a Donald Burton. Venezia instructed her to date and sign the backs of the photographs she selected and to date and initial the others. The identification was not positive, only that these two resembled the one that assaulted her. Venezia then went upstairs to John Finney's apartment and showed him the same photographs. He was not allowed to see the backs of the photographs while he was viewing them. Finney chose the same two photographs as Joli, and was also instructed to indicate his selections as Joli had. Finney's identification was also not positive.
Reinier Neslo was arrested the following day. Late that afternoon Joli Scalise and John Finney were brought to the police station to view a physical lineup. They were separated and were not allowed to confer at any time during the identification procedure. Neslo and six other black males participated in the lineup. Once they had left the stage, Scalise was interviewed in the glass room at the back of the auditorium. She thought that both number three and number six looked familiar, but was not sure. Finney was interviewed in the glass room and also made a tentative identification of numbers three and six.
At Ms. Scalise's request, the lineup was reassembled so that Finney and Scalise could get a closer look. This time they went up onto the stage with the suspects behind the glass wall. Again they were not allowed to confer with each other. When interviewed following the close-up viewing, both Scalise and Finney identified number 3, Reinier Neslo, as looking like the man that fired the shots.
At no time during any phase of the identification procedure was either Joli Scalise or John Finney influenced by the police to make any particular selection or told whether the man who fired the shots was among the choices available.
In reviewing an identification procedure, the court must determine whether the procedure was so unnecessarily suggestive *78 and so conducive to an irreparable mistaken identification that the defendant was denied due process of law. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Tribbet, 415 So.2d 182 (La.1982). A lineup is unduly suggestive if the identification procedure displays the defendant so that the witness' attention is focused on the defendant. State v. Nicholas, 397 So.2d 1308 (La.1981); State v. Robinson, 386 So.2d 1374 (La.1980). Defense counsel suggests that the combination of the composite sketch of the defendant, the two photographic lineups and the successive physical lineups was a suggestive procedure. Counsel points out that only the defendant appeared in both the second photographic lineup and the physical lineup.
After the composite sketch had appeared in newspapers, the police received phone calls saying the man resembled Reinier Neslo. Detective Venezia assembled the photographic lineup to include Neslo and others who had similar features. This is the procedure recommended by Manson v. Brathwaite, supra, and the American Law Institute's Model Code of Pre-Arraignment Procedure, § 160.2(2) (1975). Since only the defendant appeared in both the photographic and the physical lineups, there is the possibility of suggestion; that the witnesses might have remembered the defendant from the photograph and not from the night of the crime. Joli Scalise testified at the hearing that she identified Neslo both in the photographic display and in the on stage lineup, "but, when I saw him in the lineup, I hadn't remembered him from the pictures." John Finney testified to not being sure if any people in the lineup had also been in the photographs.
The evidence does not indicate that the identification procedures were unduly suggestive. The persons in the photographic lineup sufficiently resemble the defendant to properly test the identification. In fact, two photographs were selected by both of the witnesses. Likewise, the photograph in the record of the physical lineup shows that there was no suggestiveness in the conduct of the lineup. All of the participants were adequately matched for basic physical appearance and five of the seven participants, including Neslo, appear to be very close in height. Number six, who was initially selected but not chosen after the witnesses went on stage, is a few inches taller than Neslo.
At the hearing on the motion, the circumstances of the initial encounter between the defendant and the witnesses was explored. Scalise and Finney both testified that while they had been out drinking and felt pretty good, they were not drunk and their senses were sharp. They had each had four or five drinks over a four hour period. Finney had stopped drinking at 3:00 a.m. Although the 300 block of Burgundy Street was not well lighted and the incident lasted less than one minute, both the witnesses saw the gunman full face and closeup and gave similar descriptions to the police. There was adequate independent basis for the identification which outweighed any suggestiveness in the use of photographs in the identification procedure. State v. Winn, 412 So.2d 1337 (La.1982); State v. Davis, 409 So.2d 268 (La.1982).
This assignment of error lacks merit.
Assignments of Error Nos. 3, 4 and 12
By these assignments of error, the defendant contends that the trial court erred in not suppressing the defendant's confession and in allowing the confession to be read to the jury by Detective Venezia. It is also contended that the court erred in not suppressing the evidence obtained as a result of the confessionthe .32 caliber revolver.
Defendant argues that the statement was not free and voluntary; that the defendant was beaten prior to giving the statement. Further, the defense argues that there was no probable cause for the warrantless arrest of the defendant and there was insufficient attenuation between the illegal arrest and the statement to make it admissible. The gun, it is argued, was the fruit of the illegal arrest and could not have been recovered independently of the arrest and interrogation of the defendant.
*79 Reinier Neslo had been picked in the photographic lineup on Monday evening, April 21st. The next morning Detective Venezia called Neslo's mother's house in an effort to locate him, and left a message for Neslo to call back. Neslo returned the call from Kimmy Green's house, but Venezia was out; Neslo left his name and the number he was calling from. The police arrived at Green's house shortly afterward.
Detective Venezia and Officer Saucier both testified that they arrived at Green's house about 10:30 that morning. Kimmy Green came to the door and told the officers that Neslo was there. Neslo was told that he was a suspect in a murder, and he voluntarily accompanied the police to the station. Venezia called Officer Hurban to impound defendant's brown Ford Fairmont that was parked on the side of the street. One of the witnesses to the murder was a Ford salesman who had been positive about the kind of car fleeing the scene.
The defendant testified that four plainclothes officers arrested him at gunpoint at Kimmy Green's house. He stated that the officers told him that he was a suspect in an armed robbery and shooting up a bar, and that he was handcuffed and taken to the police station against his will.
Upon arriving at the homicide bureau, Neslo was told that he was a suspect in the Suzanne Theriot murder and read his rights. Neslo signed the "rights of arrestee" form and was questioned by Venezia in the presence of Saucier. The questioning was conducted in a cubicle in the larger homicide office. The cubicles are separated from the main office by cloth and metal dividing walls which extend only part of the way to the ceiling. The interview was concluded about 11:30 a.m.
Following the interview Neslo was given a lie detector test. Venezia received the results of the test at about 2:30 that afternoon and formally arrested the defendant, reading him his rights a second time, and having him walked over to be booked by Officer Hurban. Venezia and Officer Saucier then went out to find John Finney and Joli Scalise for the physical lineup, which was conducted about 4:30 that afternoon.
The defendant testified that he was beaten three times in quick succession after he was given the lie detector test and before he was taken over to be booked. He claimed there was a tall slender officer involved in the beatings. According to the defendant, he was taken to a room off of the detective bureau, handcuffed, with a white plastic bag over his head, and kicked repeatedly when he denied any knowledge of the Theriot murder. The beatings lasted for a total of forty-five minutes.
The defendant denied that he was asked if he was injured as part of the booking procedure. He did not complain to anyone that he was beaten until 2:00 o'clock that morning, approximately twelve hours after the beatings, when he was in parish prison. He wrote a letter to his mother complaining about the beatings, and she filed a complaint with Internal Affairs. Neslo later gave a complete statement to Internal Affairs.
Neslo was taken back to the homicide bureau after the lineup, where he signed a third waiver form and gave a statement beginning at 7:10 p.m. Venezia typed the questions, then read them to Neslo; as Neslo answered, Venezia typed. Officers Saucier and Hurban were present during the time the statement was given and signed each page. The defendant initialed the first three pages and signed on the fourth. The statement was completed at 8:25 p.m.
When the statement was completed, Venezia, Saucier, Hurban and Neslo went to the home of Kimmy Green. Green came to the door and Neslo told him to "go ahead and give them the gun." Green went around the side of the house, retrieved a paper bag containing a gun from under the house and handed it to Venezia.
The trial court heard testimony from all of the witnesses to the defendant's statement. Each testified that at no time was the defendant beaten, threatened or induced in any way to make the statement. The defendant's time throughout the day *80 was accounted for by the officers' testimony.
Before the state may introduce a confession into evidence, it has the burden of proving beyond a reasonable doubt that the statement was free and voluntary and not induced by threats, promises or coercion. R.S. 15:451; State v. Burkhalter, 428 So.2d 449 (La.1983); State v. David, 425 So.2d 1241 (La.1983). Where the defendant alleges police misconduct in reference to the statement, the state must specifically rebut these allegations. State v. Burkhalter, supra; State v. Serrato, 424 So.2d 214 (La.1982); State v. West, 408 So.2d 1302 (La.1982). In reviewing the trial judge's ruling on admissibility, his conclusions as to the credibility of witnesses are accorded great weight on appeal. State v. Loyd, 425 So.2d 710 (La.1982); State v. Edwards, 419 So.2d 881 (La.1982).
Detective Venezia and Officer Saucier specifically testified to the initial meeting with Neslo at Kimmy Green's house. Their testimony rebutted in detail the allegations of the defendant that he was handcuffed at that time. At trial, Kimmy Green also testified that Neslo was not handcuffed, and that the officers did not arrest him with their guns drawn. See State v. West, supra.
Detective Venezia testified that following the lie detector test, the defendant was returned to the cubicle while Venezia awaited the results. At all times the homicide office contained approximately a dozen people who would have heard any beating taking place. Venezia and Saucier testified that the defendant was in the cubicle alone during this time. While the defendant initially stated that he was beaten following the lineup, he retracted the statement and limited the beatings to the period between the lie detector test and his booking. Officer Hurban, who walked him over to be booked, denied that the defendant was walking with a limp, and specifically denied the defendant's claim that he was not asked the standard booking question about whether he was injured.
Concerning the statement itself, Neslo identified his signature and initials on the "rights of arrestee" form and on the bottom of the statement pages, but denied reading the statement before he signed it. He did admit that Venezia asked him questions and then typed, and he read the statement on the stand and remembered some of the questions. Neslo stated that he thought he was signing a report indicating the time of his arrest.
The state sufficiently rebutted the allegations of the defendant of specific instances of police misconduct. It was not an abuse of the trial court's discretion to credit the testimony of the police officers over that of the defendant. It was not error for the court to find the defendant's confession admissible as being freely and voluntarily given.
The defendant next argues that the statement should have been excluded as the fruit of an illegal warrantless arrest of the defendant. Though Venezia testified that he felt he did not have probable cause to arrest the defendant that morning at Kimmy Green's house, his subjective belief is not controlling. The defendant had been recognized by callers who had seen the composite sketch in the newspaper and called the police to give the defendant's name. Neslo had been tentatively picked by both Joli Scalise and John Finney as resembling the man who had fired the shots (see the discussion under Assignment of Error No. 2). Furthermore, the defendant's car matched the description of the car given by a Ford salesman who was at the scene of the shooting and gave a description of the car to the police.
Probable cause exists when the facts and circumstances known to the police officer, and of which he has reasonably trustworthy information, are sufficient to justify an average person, and particularly an average police officer, in the belief that the person to be arrested has committed a crime. State v. Buckley, 426 So.2d 103 (La.1983); State v. Johnson, 422 So.2d 1125 (La.1983). There was no reason to doubt the information in the possession of the *81 police; it had all come from the victims of the crime and uninvolved third parties. The police knew that a crime had been committed, and needed only reasonably trustworthy information to justify a person of ordinary caution in believing defendant committed the crime. State v. Tokman, 412 So.2d 561 (La.1982); State v. Jones, 408 So.2d 1285 (La.1982). Officer Saucier testified that the defendant was not free to leave; that he was under investigation. The police, however, had more than mere suspicion that Neslo had committed the murder of Suzanne Theriot, though they may not have had enough information for a conviction at that time. The trial court did not err in finding probable cause for the arrest of the defendant.
Having found probable cause for the defendant's arrest, his arguments that the confession and the revolver recovered from Kimmy Green's house were inadmissible as fruits of an illegal arrest are without any basis.
Defendant's final argument relating to the confession is that it was improper for the trial judge to allow the confession to be read to the jury by Detective Venezia. The defendant argues that this had the effect of bolstering Venezia's testimony and is not authorized by statutory authorities. The trial judge ruled that the confession was admissible and that "it says what it says, nothing less, nothing more. To facilitate the understanding of the jury, then so much the better." Detective Venezia read the entire statement to the jury.
The defendant has not directed this court's attention to any statutory provision or jurisprudence which support his contention that error has been committed by the trial judge in allowing the statement to be read to the jury. Nor are counsel's arguments persuasive.
These assignments of error lack merit.
Assignment of Error No. 5
By this assignment of error, defendant complains that the trial court erred in allowing the assistant district attorney to amend the first degree murder indictment immediately prior to trial. Defendant contends the amendment could only be made by the grand jury and that the amended indictment violated C.Cr.P. 464 which requires a plain, concise and definite written statement of the essential facts constituting the offense charged.
On the morning of trial the assistant district attorney amended the indictment to read (underlining indicates new language):
"... committed first degree murder of one SUE THERIOT, while in the perpetration of an attempted aggravated kidnapping, while in the perpetration of an attempted aggravated rape, while having the specific intent to kill or inflict great bodily harm on more than one person,..."
The defendant's objection to the amendment was overruled by the trial judge. The defense then submitted a written motion for a continuance which was argued and submitted, and denied by the judge. The case then proceeded to the selection of the jury.
This court has held that the prosecutor may make substantive amendments to a grand jury indictment before trial begins. State v. Lovett, 359 So.2d 163 (La.1978); State v. Sheppard, 350 So.2d 615 (La.1977); State v. Bluain, 315 So.2d 749 (La.1975). Where the defense can show prejudice as a result of the amendment, the court should grant a motion for a continuance. C.Cr.P. 489. In this case, the amendment to the indictment conformed the indictment to the state's answer to defendant's motion for a bill of particulars. There was no surprise to the defendant that the state was relying on R.S. 14:30(1) and (3) as the aggravating circumstances. The trial court properly allowed the amendment to the indictment, and did not err in denying defendant's motion for a continuance.
C.Cr.P. 465(A)(31) provides that the proper short form indictment for first degree murder is "A.B. committed first degree murder of C.D." Section B provides that the short form indictment "may also include a statement of additional facts pertaining *82 to the offense charged. If this is done it shall not affect the sufficiency of the specific indictment form authorized by this article." C.Cr.P. 486 provides that unnecessary allegations in an indictment may be disregarded as surplusage. As this indictment, both before and after the amendment, contained the allegations required by the Code of Criminal Procedure, the indictment is not defective and may serve as the basis for a valid prosecution.
This assignment of error lacks merit.
Assignment of Error No. 6
By this assignment of error, the defendant contends the trial court erred in allowing the state to present the testimony of Edward Johnson, the severed codefendant, prior to establishing the corpus delicti. Our law does not require the proof of the corpus delicti prior to other evidence. C.Cr.P. 773; State v. Mullins, 353 So.2d 243 (La.1977); State v. Hill, 135 La. 625, 65 So. 763 (1914); State v. Gebbia, 121 La. 1083, 47 So. 32 (1908).
This assignment of error lacks merit.
Assignment of Error No. 7
By this assignment of error the defendant contends that the trial court erred in allowing the severed codefendant, Edward Johnson, to testify to statements made to him by Neslo, since the state had not provided notice under C.Cr.P. 768 that it intended to introduce such statements at trial, and the statements were not part of the res gestae.
On direct examination, Edward Johnson testified as follows:
"Q Now, after all this took place, after you were dropped off at home, did you ever happen to see Reiner (sic) Neslo after that?
A Yes.
Q And where did you see him?
A On my job.
Q Did he come to you or did you go to him?
A He came to me.
Q Did he indicate to you why he came to see you?
A Yes.
Q Why did he come to see you?
A He said something had happened in the quarter.
Q Did he talk about it?
A He was more frightened than anything else.
Q Did he say anything?
A Yes. He told me somebody had gotten killed.
BY MR. LAWRENCE:
Your Honor, I'm going to object to anything that's not res gestae. We object to the comments of the witness.
BY THE COURT:
Why?
BY MR. LAWRENCE:
It's outside any res gestae, Your Honor, and no proper predicate has been layed (sic) for it. We have no notice of it.
BY THE COURT:
Overruled."
The state contends that there was no obligation to notify the defendant of the intention to use the statements since there is no admission of incriminating facts or criminal intent. The state does not contend that the statements were part of the res gestae.
C.Cr.P. 768 provided at the time of the offense:
"If the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."
This court has held that a confession is a statement which admits the commission of a crime, while the inculpatory statement admits a fact, circumstances, or involvement which tend to establish guilt or from which guilt may be inferred. State v. Quimby, 419 So.2d 951, 956 (La.1982); State v. Brumfield, 329 So.2d 181, 187 (La.1976). The account of the defendant's statements given by Johnson does not demonstrate any criminal intent. Neither do the statements that "something had happened in the quarter" *83 or that "someone had gotten killed" contain necessarily incriminating facts. However, the clear implication of Johnson's testimony, based on the defendant's statements, is that the defendant admitted involvement in the crime. The statements as presented show circumstances and involvement and are inculpatory within the meaning of C.Cr.P. 768 and should have been excluded by the trial court for lack of notice.
However, this court has held that the failure of the state to prove the defendant with the notice required by Article 768 may be harmless error where the remaining evidence of guilt is overwhelming. State v. Quimby, supra; State v. Williams, 416 So.2d 914 (La.1982); State v. Perry, 408 So.2d 1358 (La.1982); State v. Gautreaux, 377 So.2d 289 (La.1979). Such is the situation in this case. Johnson's testimony placed the defendant at the scene, with the gun in his possession, firing shots. This was corroborated by the eyewitness accounts and by the defendant's confession. Laboratory analysis matched the gun with the pellets retrieved from the victims. The defense's alibi evidence was conflicting and internally inconsistent. The admission into evidence of the defendant's statements to Edward Johnson, without the notice required by Article 768, was harmless error in view of the overwhelming evidence of defendant's guilt.
This assignment of error lacks merit.
Assignment of Error No. 9
By this assignment of error, the defendant urges that the trial court erred in permitting the prosecutor to cross-examine the defendant about the facts and circumstances surrounding a prior conviction. The defendant also contends that the trial court erred in denying the motion for a mistrial.
At trial, the defendant took the stand to testify that force was used by the police to obtain his statement. On cross-examination, the state sought to impeach his credibility with proof of a prior conviction. Neslo admitted being convicted of simple robbery, and his counsel objected when Neslo was asked about the original charge. The prosecutor argued that he was permitted to go into the facts and circumstances surrounding the conviction and the objection was overruled. When asked what the original charge was, Neslo responded, "I don't remember;" when asked whether the original charge was armed robbery, Neslo answered, "I'm not sure." The prosecutor then continued: "Were you at one time charged, while you were armed with a dangerous weapon, to wit a pistol, you robbed a man by the name of Richard Gordon?" Defense counsel objected and asked for a mistrial. The state then showed the defendant a certified copy of the previous simple robbery conviction to refresh his memory. The defendant testified that it refreshed his memory about the sentencing, but not about the original charge. Neslo stated that he was much younger at that time and that his lawyers were handling it for him. The prosecutor then cross-examined Neslo on other matters.
The defense argues that the impeachment attempt was improper and prejudicial, as well as conflicting with R.S. 15:495 and this court's jurisprudence on prior convictions impeachment, culminating in State v. Oliver, 387 So.2d 1154 (La.1980). Furthermore, the defense contends that it was error for the trial judge to admit the certified copy of the conviction which showed that the defendant was on probation at the time of the offense in violation of the holding in State v. Martin, 400 So.2d 1063 (La.1981) on rehearing. The state contends that Oliver and Martin do not pertain to Neslo's situation where the defense initially asserted that the simple robbery conviction was the result of a plea bargain. Instead, the state relies on State v. Sykes, 364 So.2d 1293 (La.1978). Finally, the state contends that any error was harmless beyond a reasonable doubt.
Evidence of prior convictions is permitted for impeachment purposes by R.S. 15:495 which provides:
"Evidence of conviction of crime, but not of arrest, indictment or prosecution is *84 admissible for the purpose of impeaching the credibility of the witness, but before evidence of such former conviction can be adduced from any other source then the witness whose credibility is to be impeached, he must have been questioned on cross-examination as to such conviction, and have failed distinctly to admit the same; and no witness, whether he be defendant or not, can be asked on cross-examination whether or not he has ever been indicted or arrested, and can only be questioned as to conviction, and as provided herein."
In State v. Jackson, 307 So.2d 604 (La. 1975), this court held that it was not improper to cross-examine a witness about details of a prior conviction for the purpose of establishing the true nature of the offense. Since it is the "bad act" and not the conviction that is relevant to the witnesses' credibility, the details of the bad act are also relevant. The rule is limited to convictions in order to prevent surprise to the witness and limit the inquiry to readily determinable and easily proved matters. State v. Jackson, supra at 607-08.
The rule of Jackson has been expanded to allow impeachment of defendants testifying on their own behalf with details of prior convictions. State v. Chaney, 423 So.2d 1092 (La.1982); State v. Smith, 419 So.2d 468 (La.1982); State v. Talbert, 416 So.2d 97 (La.1982); State v. Talbot, 408 So.2d 861 (La.1980) (on rehearing new trial ordered on other grounds); State v. Kimble, 407 So.2d 693 (La.1981); State v. McKeever, 407 So.2d 662 (La.1981); State v. Martin, supra; State v. Brown, 371 So.2d 746 (La. 1979), reversed on other grounds, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980); State v. Sykes, supra; State v. Thompson, 364 So.2d 908 (La.1978); State v. Carter, 363 So.2d 893 (La.1978); State v. Dupar, 353 So.2d 272 (La.1977); State v. Elzie, 351 So.2d 1174 (La.1977); State v. Chenier, 343 So.2d 177 (La.1977); State v. Jackson, 339 So.2d 730 (La.1976); State v. Williams, 339 So.2d 728 (La.1976); State v. Elam, 312 So.2d 318 (La.1975).
This court has also recognized the danger of prejudice to a defendant that may result from placing evidence of past bad acts before the jury, and has placed limits on the Jackson cross-examination. State v. Talbot, supra; State v. Connor, 403 So.2d 678 (La.1981); State v. Martin, supra; State v. Oliver, supra; State v. Brown, supra; State v. Johnson, 368 So.2d 719 (La.1979). The extent to which an inquiry into prior convictions is permitted depends on the facts of each case, the trial court having great discretion to control the length and depth of the examination. State v. Talbot, supra; State v. Brown, supra.
In commenting on the progeny of State v. Jackson, supra, this court stated in State v. Oliver, supra at 1156:
"... None of the cases extending the ruling of Jackson to defendants testifying in their own behalf involved the extreme prejudice presented here. Jackson must be narrowly, rather than broadly, construed and care must be taken to avoid prejudice to the rights of the accused by expansive reference to details of a former conviction."
The court then reviewed cases in which impeachment of defendants with prior convictions was permitted and noted that little or no prejudice resulted from the inquiries. In contrast, under the facts of Oliver, there was great prejudice to the defendant, who was portrayed to the jury by the prosecutor's accusations as a rapist. The court was able to conclude that "the record strongly indicates that this evidence, which had no probative value, led the jury to convict Oliver because he was a bad person who had probably committed this double murder." Id. at 1157.
The defendant contends that the state's purpose in inquiring into the original charge was to infer the existence of a pistol on that previous occasion. The defense argues that since at trial the defendant was found guilty of simple robbery there was no pistol, and that was the "true nature" of the offense and therefore the inquiry into the original charge did not have a valid purpose. We are not prepared to accept the *85 defendant's argument. The fact that he was not convicted of armed robbery and was convicted of simple robbery is not conclusive proof that there was no gun involved in the incident. There are reasons why a gun might have been inadmissible at trial, or the gun might have disappeared, or, for some other reason, the judge might have chosen to return the lesser verdict. In any event, we cannot find here that the evidence indicates that the jury convicted Neslo because he was a bad person. There is overwhelming evidence that the defendant committed the crime for which he is presently stands convicted. The cross-examination about the true nature of the prior offense did not show that defendant was denied a fair trial.
The defendant also objected to the use and introduction of a certified copy of his prior conviction, which showed the defendant to be on probation at the time of trial. This court has held that evidence of probationary status is irrelevant to the issue of credibility, and therefore is improper impeachment. State v. Connor, supra; State v. Martin, supra; State v. Johnson, supra. The certified copy was shown to the defendant to refresh him as to the original charge. The defendant answered before the jury that it did not refresh him on the original charge, but volunteered that it did refresh him as to the sentencing. The copy was shown to the jury at the close of the state's case along with all the other exhibits.
The record indicates that the state made no reference to the defendant's sentencing for the simple robbery or the fact of his probationary status. If the jury ever knew that the defendant was on probation, we believe that it did not have any effect on the outcome of the case. As previously stated, the evidence against the defendant is overwhelming.
This assignment of error lacks merit.
Assignment of Error No. 11
In this assignment of error the defendant contends the trial court erred in allowing the state to impeach the defendant with a prior inconsistent statement made to Police Internal Affairs. The defense claims that the statement is a collateral matter not subject to impeachment, and that it was improper to read portions of the statement before the jury for impeachment purposes.
In connection with his arrest, Neslo had made a statement to Internal Affairs in which he relayed his version of the facts surrounding his arrest and questioning. At the time the statement was made, Neslo was informed that anything he said could be used against him. Neslo signed a form acknowledging and waiving his rights.
At trial, Neslo took the stand to testify on the predicate to the admission of his confession. He testified that the statement was not freely and voluntarily given since it was forced from him after several beatings. The officers had previously testified as to Neslo's whereabouts on the day of his arrest and the order of events. On cross-examination, the prosecutor questioned Neslo about the specific times of the beatings and their relation to the other events of the day (arrest, questioning, booking, lineup and retrieving the gun). When the cross-examination came to the trip to Kimmy Green's house to retrieve the gun, Neslo testified that he had stayed in the car and only the detectives had walked up to the door and spoken with Kimmy. The prosecutor then asked Neslo if he remembered making a statement to Internal Affairs. Over defense objections, the state was allowed to impeach the defendant with the prior inconsistent statement in which the defendant stated that he had walked onto the porch and spoken with Kimmy.
The defense contends that the events at Kimmy Green's house are collateral matters and not proper for impeachment under R.S. 15:494, which provides:
"It is not competent to impeach a witness as to collateral facts or irrelevant matter."
It was the defense questioning that introduced the subject of the trip to Kimmy Green's house. Over the state's objection, Neslo was asked about the time Neslo and the police went to retrieve the gun. Allowing *86 the state to cross-examine the defendant on this matter for impeachment was proper. State v. Fletcher, 210 La. 409, 27 So.2d 179 (1946). See also State v. Ledoux, 157 La. 821, 103 So. 177 (1925); State v. Walters, 135 La. 1070, 66 So. 364 (1914); State v. Bellard, 132 La. 491, 61 So. 537 (1913); State v. Swindall, 129 La. 760, 56 So. 702 (1911).
The defendant further contends that the state did not conduct the impeachment in the proper manner since the foundation was not properly laid. Though the prosecutor had some difficulty in following the proper procedure, the impeachment was finally properly accomplished.
This assignment of error lacks merit.
Assignments of Error Nos. 14 and 15
These assignments relate to the refusal of the trial judge to order the grand jury testimony of state's witness Kimmy Green.
Kimmy Green testified concerning the apprehension of the defendant by the police from his house and the return later that evening of Neslo and the police to retrieve the gun. On direct examination, Green stated that he had also testified before the grand jury, and had been arrested and charged with perjury following that appearance. Green admitted at trial that he had lied to the grand jury. When asked if he had decided to now come forward and tell the truth, the defense objected and requested an admonition to the jury to disregard the leading question, which was denied. Testimony continued with Green stating that his lawyer had contacted the prosecutor about testifying at trial in exchange for dropping the perjury charge. Later, while Green was on the stand for redirect examination, defense counsel called for the grand jury transcript, which was also denied.
The defendant argues that under the facts of this case there are special circumstances that required the grand jury transcript be available to insure the defendant's right to a fair trial. Specifically, the defendant suggests that it was improper for the state to seek to bolster the testimony of Green at trial by reference to his alleged perjury before the grand jury, while not allowing the facts of the former testimony before the court so the jury could make its own determination as to the present credibility of the witness.
The well settled practice in Louisiana is to keep testimony before a grand jury secret. See Note, Use of Grand Jury Testimony to Impeach Credibility at Trial, 18 Loy.L.Rev. 468 (1972) for a discussion of the development of the rule presently set forth in C.Cr.P. 434, which provides in part:
"A. Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury. However, after the indictment, such persons may reveal statutory irregularities in grand jury proceedings to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand jury with counsel for a person under investigation or indicted, with the attorney general or the district attorney, or with the court."
This court has held that unless the request for the grand jury testimony falls within either of the two exceptions listed in the article, it cannot be used for impeachment on cross-examination. State v. Martin, 376 So.2d 300 (La.1979), cert. denied, 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980). This court has also specifically interpreted Article 434 to hold that the testimony of a witness before a grand jury is inadmissible to prove a witness' prior inconsistent statement at trial. State v. Terrebonne, 256 La. 385, 236 So.2d 773 (1970); State v. Martin, supra; State v. Sheppard, supra; State v. Ivy, 307 So.2d *87 587 (La.1975). Rather, the purpose for the exception relating to perjury is to allow the perjured testimony to be introduced where the grand jury witness is being criminally charged with perjury. State v. Terrebonne, supra.
Under the present facts, there was no harm to the defendant due to lack of access to grand jury testimony. The prior inconsistent statement could only have been used to question the credibility of Kimmy Green (and not for the content of the statement). Green admitted that he had lied before the grand jury; further impeachment would only have been cumulative. Moreover, the jury was fully apprised of the arrangement between Green and the prosecution and could fully evaluate his credibility at trial without the content of the prior lie.
These assignments of error lack merit.
Assignment of Error No. 16
In this assignment of error, the defendant reurges his objection to the introduction of certain items of evidence, specifically, S-1, a pistol; S-6, photographs; S-7 and S-9, "rights of arrestee" forms; S-10, defendant's written statement, S-12, six live cartridges; S-11, a certified copy of defendant's prior conviction. We have considered each of these items in connection with defendant's other assignments of error, and have concluded that the defendant's objections to the introduction of these items are without merit.
Assignment of Error No. 17
In this assignment of error the defendant complains of the trial court's refusal to grant defendant's motion for a new trial. It is contended that the defendant was denied due process of law because the state failed to prove beyond a reasonable doubt the elements of "specific intent to kill or inflict great bodily harm" and "identification."
The standard of review set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires the determination of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the elements of the crime beyond a reasonable doubt. This standard has been adopted in Louisiana. State v. Blackburn, 403 So.2d 719 (La.1981); State v. Fontana, 396 So.2d 1251 (La.1981); State v. Harveston, 389 So.2d 63 (La.1980).
The relevant portions of the first degree murder statute, R.S. 14:30, are:
"First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;
. . . . .
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or
. . . . .
Specific intent is defined in R.S. 14:10(1), which provides:
"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
On proof of intent, R.S. 15:445 provides in part "... for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction."
There is ample evidence in this record, when viewed in the light most favorable to the prosecution, that the defendant had the specific intent to kill. The eyewitnesses testified that defendant pointed the gun at his victims and deliberately fired the shots. See State v. Procell, 365 So.2d 484, 492 (La.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979). Neslo first fired in the face of John Finney, who was wounded in the mouth, and then shot Suzanne Theriot, who was killed after resisting *88 defendant's efforts to force her into the automobile. While there was no evidence of attempted rape, there was sufficient evidence to establish an attempted kidnapping. John Finney specifically testified that the "gunman tried to put Sue in the front seat, and Sue was a little reluctant to do it." After she struggled free, "she started to run away from him. She got about two steps, and for some reason, she just turned her head around. When she did, that's when the guy picked up the gun and shot her. I remember seeing him shoot her. I remember seeing the gun. He put the gun up, I saw another flash come out the barrel."
There is in this record ample evidence of the identification of Neslo as the gunman who fired the shots. He was identified by Edward Johnson, the severed codefendant and acquaintance of Reinier Neslo. The defendant was identified by both John Finney and Joli Scalise who saw the defendant at the scene firing the shots. Any rational trier of fact could conclude beyond a reasonable doubt that Reinier Neslo fired the shot that killed Suzanne Theriot.
This assignment of error lacks merit.
Assignments of Error Nos. 8, 10 and 13 were expressly abandoned in defendant's brief and were not considered by this court.
For these reasons, the conviction and sentence of defendant are affirmed.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
Although the prosecution may conduct a limited inquiry into the details of a prior conviction, as permitted in State v. Jackson, 307 So.2d 604 (La.1975), and limited by State v. Oliver, 387 So.2d 1154 (La.1980), the prosecution may never question the defendant about a prior indictment.[1] Although the overwhelming evidence of defendant's commission of this crime renders the trial judge's error in permitting the questioning harmless beyond a reasonable doubt in this case, such questioning may well require a reversal in other cases.
NOTES
[1] The trial court apparently failed to distinguish between the details of the accusation and the details of the proved crime.