870 So.2d 428 (2004)
STATE of Louisiana Appellee
v.
Stewart C. MOREHEAD Appellant.
No. 38,124-KA.
Court of Appeal of Louisiana, Second Circuit.
April 2, 2004.
*430 Louisiana Appellate Project, By Margaret S. Sollars, Counsel for Appellant.
Jerry L. Jones, District Attorney, Stephen T. Sylvester, Shirley M. Wilson, Assistant District Attorneys, Counsel for Appellee.
Before PEATROSS, DREW and LOLLEY, JJ.
DREW, J.
Stewart C. Morehead was convicted of second degree murder and sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence, from which conviction and sentence he appeals. We affirm.

FACTS
The defendant was initially charged by indictment with first degree murder, later reduced to second degree murder, the offense for which he was tried, convicted, and sentenced. The victim, Ezekiel Jones,[1] was the lover of defendant's wife, Clarissa Morehead ("Clarissa"). Sometime previous to the night of the murder, defendant discovered the illicit relationship and threatened her. She agreed to a plot so that Morehead could kill her lover. The victim was last seen alive in Monroe, Ouachita Parish, just after midnight on July 9, 1999, as he entered Clarissa's van. Jones *431 was savagely killed. Two days later, the body was found in Richland Parish.
Prior to trial, Clarissa agreed to testify against the defendant in exchange for the state accepting her plea of guilty to manslaughter. Three days before trial, the defendant filed a motion to quash for lack of jurisdiction, as the body was found in Richland Parish and no physical evidence was found in Ouachita Parish. Defendant argued that venue in Ouachita Parish was thus improper, as the trial court lacked jurisdiction of the case. By agreement, disposition of the motion was deferred to the merits.

TESTIMONY
Clarissa Morehead
Under a grant of use immunity, Clarissa Morehead testified that:
 She and the defendant had a plan to kill Jones because of her infidelity with Jones.
 Her role was to lure Jones to a selected location on Green Road in Ouachita Parish.
 On the night of July 8-9, 1999, the defendant armed himself with a revolver and hid under a blanket in the back of the van while she drove around looking for Jones.
 She asked a teenager, Roderick Greely, to help find Jones.
 She waited for Jones in the parking lot of a Hyde Food Store, where Debra Greely ("Big Deb") saw her.[2]
 About midnight, Jones approached Clarissa, and she told him that she had rented a motel room in Rayville for a romantic liaison.
 Jones told her that he couldn't leave for another 30 minutes.
 She drove back to her home, where the defendant asked her to get a hunting knife out of his work truck.
 Around 12:30 a.m., with the defendant again in the back of the van, she drove back to the parking lot and picked up Jones.
 She drove to the Green Road location.
 When the van stopped, Clarissa asked Jones to open the van's passenger door, so they could get into the back of the van.
 As Jones got out to open the door, Clarissa saw her husband waiting at the door for Jones.
 As Jones was opening the rear passenger door, she heard gunshots.
 Afterwards, the defendant came around to the driver's side of the van and told her that everything would be okay.
 She went around to the other side and saw Jones' body.
 She watched as the defendant pulled the body into the woods.
 She and the defendant then got into the van and drove to a car wash, where the defendant washed the outside of the van.
 They then headed home, where the defendant told her to get some trash bags.
 They changed clothes, placing the clothes worn during the murder into the small trash bags.
 The bags of clothes and the handgun were discarded on Sunny Day Road in Ouachita Parish.
*432  The clothes shown her at trial were the same clothes they had discarded on Sunny Day Road.
 After disposing of the clothes, they went back to Green Road, where the defendant put the body into two large trash bags while she held a light.
 The defendant loaded the body into the bed of his truck, and the two drove to a secluded area on Bayou Lafourche, in Richland Parish.
 With Clarissa holding a light, defendant shoved the body into the bayou.
 Later, the defendant cleaned out the back of his truck with a power washer, then went to work, at which time Clarissa went to sleep.
 She admitted giving three conflicting statements to the police.
 She denied seeing the gun or the knife at Green Road, but the defendant did tell her, as they were driving along Sunny Day Road, that he was throwing out the gun.
Roderick Greely
Roderick Greely, 17 years old at the time of trial, 15 years old at the time of the murder, testified that he was out walking on the night of July 8, 1999, and Clarissa stopped him to ask his help in locating Jones. Greely told Jones that Clarissa was looking for him, and watched as Jones went to the van driven by Clarissa. He then walked back down the street to Jones' girlfriend's house. Greely was unsure about this time frame.
Neal Harwell
Detective Neal Harwell of the Louisiana State Police Bureau of Investigations, testified that in his investigation of the July 9, 1999, murder of Ezekiel Jones:
 He photographed the body and the crime scene, establishing that the body had six gunshot wounds and a slit throat.
 The wounds inflicted would normally result in a large loss of blood, but no blood was found in the area around the body.
 The only blood found was on the victim's shirt.
 Roderick Greely told him that he had seen Jones with Clarissa that night.
 The next day, Harwell and other officers went to the Morehead home to interview Clarissa, ascertaining that she and the defendant were not home.
 As they were in the driveway, a Sergeant Harold noticed what looked like possible blood stains on the back glass of the van.[3]
 The defendant later signed a waiver to allow the van to be searched.
 When he first interviewed Clarissa, she only admitted briefly meeting with Jones on that night because she had loaned him some money in the past, and did not want her husband to find out.
 She next told him that she was at Janice Morehead's playing dominos that night, until two or three o'clock in the morning.
 He (Harwell) then asked about the second meeting that night, at which time Clarissa became emotional and told Harwell that the defendant was going to kill her and that it was either Jones or her.
 She then told the officers about the defendant hiding in the back of the van as she lured Jones into the van and drove to Green Road, where the defendant shot and stabbed Jones to death.
*433  She told of their disposal of the gun, coming back home, getting the truck, and then taking the body to Bayou Lafourche.
 The officer had Clarissa take them to the site on Green Road to look for evidence, but as they were waiting for the crime lab to show up, a hard rain, lasting several days, began to fall.
 Because of this rain, no evidence was recovered at the Green Road site.
 Clarissa showed them the creek where the gun was discarded.[4]
 With Clarissa's information, the plastic bag of clothing was located off Sunny Day Road, not far from where the gun was later found.
 Det. Harwell acknowledged that Jones' socks, although listed in the autopsy report, were now missing, explaining that the socks found in the bag at the defendant's place of employment could not have been the victim's socks.[5]
Patrick Lane
Patrick Lane, from the Louisiana State Police Crime Lab, was accepted as an expert in the field of ballistics and weapons identification. He testified that:
 The blood evidence at the Bayou Lafourche crime scene may have been lost because of rain.
 No relevant evidence was recovered from the Green Road crime scene.
 He received for testing a RG brand .38 Special caliber revolver with black tape on the grip.
 He could find no identifiable fingerprints on the black tape from the grip.
 He received six fired cartridge cases removed from the gun, as well as the slugs recovered from Jones' body.
 The casings were made by Remington Peters and the recovered bullets were Remington Peters 130 grain full metal jacket bullets, a somewhat unusual bullet in the market.
 He compared the bullets with other bullets fired from the revolver in question and reached the opinion that the bullets recovered from Jones' body were fired from the RG revolver found on Sunny Day Road.[6]
Alejandro C. Vara
This LSP Crime Lab Forensic Scientist was accepted as an expert in the field of serology. He testified that:
 He tested the bloodstains on the defendant's shoes and socks.
 DNA testing of the shoes' bloodstains could not exclude Jones as the donor.
 The Moreheads were excluded as the donors of the blood on the shoes.
 DNA testing did not produce enough alleles[7] in the shoe sample for him to definitely testify that the blood sample on the shoe came from Jones, theorizing that something in the shoe material prevented the necessary amplification *434 to the DNA required for a full analysis of the sample.
 The odds that someone other than Jones was the donor of the DNA found on the socks were one in "hundred seventeen trillion."
 As to blood found on a tissue taken from the same bag as the shoes and socks, DNA testing excluded Jones and the Moreheads as donors.
 No bloodstains were found on any of the remaining clothing recovered.
 The plastic bag containing the clothing tested positive for blood, but the origin of the blood may have been either human or animal blood.
 The plastic bag containing the shoes and socks did not test positive for blood.
 No blood was found on the hunting knife discovered in the defendant's truck, the van, or the truck.
Dr. Steven Timothy Hayne
Dr. Steven Hayne, who was accepted as an expert in the field of pathology, practicing in the field of anatomic and clinical forensic pathology, testified that:
 He conducted the autopsy of Jones, finding that Jones died of the combination of three gunshots to the abdomen, three gunshots to the chest, and a knife wound to the neck.
 There were other non-lethal slash and stab wounds on the chest and neck, plus abrasions on the back indicating that Jones' body had been dragged by someone holding his left foot.
 The angle of entry of the bullets into Jones' body indicated that he was on the ground when he was shot at close range, with all gunshots being independently lethal.
 The shots came close together, probably being fired by the same shooter.
William Gibson, Jr.
This witness, a nephew of the defendant, identified the RG .38 Special caliber revolver and the box of Remington Peters.38 Special ammunition in evidence as belonging to him. Gibson testified that a few weeks before July 8, 1999, the defendant asked to borrow the gun, because of prowlers around his home. He further testified that a few days before July 8, 1999, the defendant came to see him a second time and gave him a card with the defendant's phone number on it, telling Gibson that he wanted Gibson's help in getting "Tupac" into the country, because "he was going to kill that m* * * * *_f* * * * *."[8]
Debra Greely
Debra Greely (referred to in other testimony as "Big Deb"), testified that:
 About midnight on the night in question, she was in front of the Hyde Food Store where she saw Clarissa in her van, acting nervous.
 When she asked Clarissa why she was out so late, Clarissa claimed to be there to make a phone call, although Big Deb never saw her make a call.
 She had been present when her nephew made a statement to the police that Clarissa asked him to find Jones around 1:00 a.m., acknowledging that this time frame was later than her encounter with Clarissa around midnight.
Janice Morehead McGee
This sister of the defendant testified that on July 10, 1999, Clarissa called her and said that she needed to talk to her, *435 after which she and her husband met with Clarissa, who said that she needed an alibi, asking McGee to tell the police that Clarissa was at home playing dominos and planning a birthday party for the defendant, on the night of July 8-9, 1999. McGee admitted that she never provided this information to the police.
Marguita Boatwright
This witness was the daughter of the defendant, and the half-sister of Clarissa. She testified that:
 On July 8-9, 1999, all of them were home until about midnight, when Clarissa left alone in the van.
 She told the defendant that Clarissa had gone to the store.
 After looking into some cabinets, Morehead said he was walking to the store.
 He returned a few minutes later, telling her that Clarissa had not gone to the store.
 He nervously waited at home until Clarissa came home around 1:30 or 2:00 a.m.
 Morehead and Clarissa then left in his work truck, advising her that if anyone inquired, to tell them that they were taking Uncle John to Shreveport.
 The defendant and Clarissa came home some time in the night, then left together again around 6:00 or 7:00 a.m.
Stewart C. Morehead
After the jury was allowed to make a closely-monitored inspection of the defendant's van and his work truck, the defendant testified that:
 Prior to Jones' death, he and Clarissa were having marital difficulties, having been counseled in June of 1999 by his brother, Rev. Jeffery Morehead.
 He never threatened to kill either his wife or Jones.
 On the night of July 8, 1999, he was shaving when his wife left in the van, whereupon he walked to the corner to see if she really went there.
 At that time, he saw "that Greely girl" on her porch.
 He came home and was sitting on his porch when Eddie Bond came by to visit with him.
 He also visited with his next-door neighbor, Jessie Bryant, after which he and Bond went into the house and drank some beer.
 When looking in a cabinet, the defendant noticed that his .38 Special caliber revolver was gone, as well as his.22 magnum revolver.
 He was home when Clarissa returned in the van.
 He did not remember the time of her return.
 Clarissa was nervous, crying and shaking, asking him to please help her.
 She got a change of clothes and the two left in the defendant's work truck.
 At her direction, the defendant drove to his place of employment, where he made some coffee and tried to find out what Clarissa was talking about.
 Although Clarissa said, "he's dead," he never asked who was dead.
 He inquired as to the whereabouts of the revolver.
 She told him that it was underneath the seat of the van.
 She changed clothes at his office.
 He denied that the socks recovered from the dumpster were his.
 He denied receiving the .38 Special caliber revolver from his nephew.
On cross-examination, the state asked the defendant whether he had been convicted *436 of manslaughter in the mid-eighties. Defense counsel objected on the grounds of inadequate discovery as to this matter. Outside the presence of the jury, defense counsel argued that the manslaughter conviction was not listed on the "rap sheet" he was provided, and that the state had told him that it was not going to use other crimes evidence. The state argued that although the manslaughter conviction was not in the rap sheet, it was an Oklahoma conviction and included in a group of Oklahoma documents provided to defense counsel. The trial court recessed for the day, ordering the parties to brief the issue.
After reviewing the record and the memorandum from counsel, the trial court made a limited ruling that the state had given notice of the prior manslaughter conviction when it provided the Oklahoma documents to the defense counsel on January 11, 2002, and denied the defendant's objection.
When testimony resumed, the state again asked the defendant about this conviction, with the defendant answering that he did not recall the exact Oklahoma charge to which he pled guilty, but that he did receive a four-year suspended sentence. The state asked no further questions on that issue. The state asked the defendant about his wife's employment just prior to the murder, and the defendant couldn't recall. The defendant testified about problems he was having in the neighborhood the year prior to the murder.
The defendant further testified that:
 Debra Greely did not testify that she saw him on the night of the murder because no one asked her whether or not she had seen him.
 Eddie Bonds came over around 11:45 p.m., staying until after 1:00 a.m.
 He did not know why his daughter Marguita did not testify about the drinking with Bonds.
 He learned of his wife's affair from their children, who told him that a "Cool Pop" had his hand on her butt and said he was going to kill their daddy.
 What he told his nephew was that he needed the gun because guys were shooting around the neighborhood.
 He couldn't recall whether he told his nephew about his wife's affair.
 He couldn't recall whether he told his nephew to help him lure Jones out into the country to kill him.
 He didn't recall what Clarissa did with her clothing that night.
After this testimony, the state re-urged the dismissal of defendant's motion to quash for lack of jurisdiction. The trial court ruled that the evidence was clear that the planning of the murder and the luring of the victim into the van all took place in Ouachita Parish, and that Clarissa's testimony clearly established that the infliction of these injuries all occurred in Ouachita Parish.
The defendant's exception of lack of jurisdiction was denied.
Jessie J. Bryant
Jessie J. Bryant testified that he was the defendant's next-door neighbor on July 8, 1999, and that he (Bryant) was often up in the middle of the night to smoke and because of noise in the neighborhood. When asked if he recalled if he saw the defendant at home on the night of the murder, Bryant did not directly answer. Neither side followed up on Bryant's inconsequential testimony.
Eddie D. Bonds
Eddie Bonds, a longtime friend of the defendant, testified that he had been to the defendant's house to drink with him. *437 When asked if he did so on the night of Thursday, July 8, 1999, Bonds said he had visited the defendant one evening around that time to borrow some money, but could not put a date on it.
Clarissa Morehead
When asked about her statements to police that she had loaned money to Jones, Clarissa testified that she never lent money to anyone, and that the defendant told her to say that, as well as the fake domino game alibi. When asked why she only provided an alibi for herself and not for the defendant, she replied she didn't remember.
Clarissa accused Boatwright of lying about Clarissa leaving the home alone on July 8, 1999. She couldn't remember how the defendant placed Jones' body into the back of the work truck.
Mark Sutterfield
Mark Sutterfield testified on rebuttal that he was employed at the same place as the defendant, although when first asked, he could not identify the defendant. Sutterfield testified that about a week before Jones was murdered, the defendant overheard Sutterfield talking with another co-worker about a cheating spouse, whereupon the defendant told Sutterfield that if he ever found out that his wife had been cheating on him that he would kill both of the "MFs." He testified that he told the police about this statement about two days after Jones was killed.
Debra Greely
Debra Greely testified on rebuttal that she never saw the defendant that night.
Neal Harwell
Detective Harwell testified on rebuttal that when questioned, the defendant told him he did not know Jones and that he had been home all night on July 8-9, 1999. He further testified the defendant did not tell him the following, concerning the evening of the murder:
 that Mr. Bonds came to his home;
 that Mr. Bryant was around;
 that he saw Ms. Greely while walking to the store; nor
 that his wife went out alone that night.
After deliberations, the jury found the defendant guilty of second degree murder. The defendant filed a motion for post-verdict judgment of acquittal, which was denied by the trial court. The trial court sentenced the defendant to life imprisonment, without benefit of probation, parole, or suspension of sentence. The court granted defendant's pro se motion for an out-of-time appeal.

DISCUSSION
I. Sufficiency of the Evidence
La. R.S. 14:30.1 provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or inflict great bodily harm.
Our jurisprudence concerning sufficiency of the evidence is clear.[9]
*438 The defendant argues that his wife's testimony was untruthful, inconsistent, and unworthy of belief. These assertions are not supported by the evidence.
Jones was found shot to death, having been last seen getting into a van driven by the defendant's wife, who confessed to being a part of the killing. She took the police to the original murder scene, helping to retrieve crucial evidence, and explained how the defendant lay in wait in the back of the van. At the defendant's request, the jury examined the van with the defendant crouching in the back, for the stated purpose of determining whether or not this was possible.
The state clearly established that the gun in question was the murder weapon. The salient portions of Clarissa's testimony was borne out by other evidence, particularly as to motive and time frame. Defendant's nephew corroborated the history of this firearm getting into the possession of the defendant, as well as defendant's threat against "Tupac" for having an affair with Clarissa. The state established that Jones could not be excluded as the DNA donor of the bloodstains found on the defendant's shoes. It was Jones' blood on the socks, found in the garbage along with the defendant's shoes, and other household garbage identified with the defendant, found in the dumpster at the defendant's work. Defendant's testimony, at least the portion intended to be exculpatory, was heard, but not believed by the trier of fact. Morehead could not recall many important matters on the stand.
The defendant also attempted an alibi defense, testifying that he was at home at the time of the murder. His testimony and that of these alibi witnesses did not shift the burden of proof from the state. In order to carry its burden of proof under the Jackson rationale, the state was required to negate any reasonable probability of misidentification. State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); and State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 *439 So.2d 1008 (on rehearing), writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
The closest to corroboration of his alibi was that of his daughter Marguita Boatwright, who testified that Clarissa left alone in the van, returned, and then the defendant and Clarissa left together in the truck. None of his other witnesses helped whatsoever in this defense. A review of the evidence in a light most favorable to the state, shows that a reasonable jury could have found that the defendant murdered Ezekiel Jones.
II. Ineffective Assistance of Counsel
The defendant argues he received ineffective assistance of counsel in the manner in which the objection to jurisdiction was raised and the failure to note a prior conviction and allowing the introduction of other crimes evidence.
The state replies that trial counsel's actions did not constitute ineffective assistance of counsel, but if error was made, it was harmless and would not have affected the outcome of this trial.
La. C.E. art. 609.1 provides:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
C. Details of convictions. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense.
La. C.E. art. 404(B) provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.
*440 The defendant argues that his trial counsel's ineffectiveness deprived him of his constitutional right to effective assistance of counsel. The law pertaining to ineffective assistance of counsel is clear.[10]
Defendant has raised two instances of ineffective assistance of counsel.
A. Disposing of Jurisdiction Issue During Trial
Three days before jury selection began, the defendant's trial counsel filed a motion objecting to the trial court having jurisdiction to hear the case, based on the fact that the physical evidence (i.e., the body), suggested that Jones was killed in Richland Parish, not Ouachita Parish, arguing that the only evidence linking the murder to Ouachita Parish was the inconsistent and untrustworthy statements of Clarissa. The trial court only became aware of the motion as the jury voir dire was beginning. By agreement, the trial court's ruling on this motion was deferred to the merits. The trial court found the state had clearly established that the murder *441 had occurred in Ouachita Parish, and denied the defendant's motion.
On appeal, the defendant argues that the action of his trial counsel in not filing the motion earlier constitutes ineffective assistance of counsel.
In the present case, other counsel may have indeed filed the objection to jurisdiction well before trial. But, in this case, the record clearly indicates that the late filing may well have been part of a trial strategy by the defendant's trial counsel. Defendant bears a difficult burden of overcoming a strong presumption that the challenged action of his trial counsel reflected sound trial strategy because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. Had the perceived jurisdictional (on account of improper venue) issue been successfully raised before trial, the trial court would have merely moved the case to Richland Parish or heard the matter with a Richland Parish jury. See, La. C. Cr. P. arts. 623 and 623.1.
But, in this case, the defendant's trial counsel filed the motion just before trial, then agreed to have the matter decided only after jeopardy had attached, so as to forbid a possible retrial, should this motion be successful. Likewise, even if the trial court, as it did in this case, found jurisdiction to be proper in Ouachita Parish, defendant's trial counsel was still free to argue the same jurisdictional defect to the jury. Had the jury been convinced that this element of the crime had not been proven, it could have acquitted the defendant.
The record does not show any error on the part of the trial court in applying an incorrect burden of proof on the state. The jury was charged to find, beyond a reasonable doubt, that the offense occurred in Ouachita Parish. Because the jury was properly instructed as to the ultimate burden of proof as to all elements of the offense, any error by the trial court as to this inquiry, would be harmless.
B. Other Crimes Evidence
Defendant argues that his trial attorney erred in allowing the jury to hear of his Oklahoma manslaughter convention, causing him prejudice. La. C.E. art. 609.1(A) provides, "In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below."
Defendant's hindsight argument confuses the law of impeachment of witnesses with prior convictions, pursuant to La. C.E. art. 609.1, with use of other crimes evidence pursuant to La. C.E. 404(B), and State v. Prieur, 277 So.2d 126 (La.1973). In the present case, the state asked the testifying defendant about prior convictions only to impeach his testimony pursuant to La. C.E. art. 609.1. The state only asked the defendant if he had a prior conviction. The defendant admitted that he did. The state did not ask any questions about the facts of the crime. Instead, the state proceeded directly into questioning the defendant as to the instant offense. There is no evidence in the record that the state asked the question about a prior conviction to show motive, intent, knowledge, identity, absence of mistake or accident.
As provided for in State v. Johnson, 664 So.2d 94 at 99 (La.1995), rehearing denied, 94-1379 (La.4/8/96), 671 So.2d 332:
In this case, the state relied upon La. C.E. art. 609.1, which allows impeachment of a witness in a criminal case by evidence of prior convictions. If a defendant chooses to testify, this provision authorizes credibility testing with evidence *442 of prior criminal convictions. See State v. Tassin, 536 So.2d 402 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989); State v. Neslo, 433 So.2d 73 (La.1983) (both decided under former LSA-R.S. 15:495). Evidence regarding previous arrests, indictments, prosecutions or other criminal proceedings not resulting in convictions is prohibited.
A trial court's ruling on the admissibility of other crimes will not be overturned absent an abuse of discretion. State v. Blackwell, 30,281 (La.App.2d Cir.11/10/97), 701 So.2d 1389, writ denied 97-3073 (La.2/13/98), 709 So.2d 755.
The Louisiana Supreme Court in State v. Johnson, supra, also applied the harmless error analysis to claims of improper use of prior convictions. Under Strickland, supra, an ineffective assistance of counsel claim is also subject to a harmless error analysis.
There is no evidence that defendant's trial counsel was ineffective on this issue. It appears from the discussions on this subject that the defendant may not have been entirely forthcoming with his record. It also appears that the defendant's trial counsel was initially concerned with the manslaughter conviction being used as other crimes evidence pursuant to La. C.E. art. 404(B). The trial court's ruling was very clear that all procedural requirements would have to be met if that were the case.
But, even had defendant's trial counsel committed error, it does not appear that the error was so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra, at 2064. Because the defendant chose to testify, he could be impeached regarding any prior convictions. The testimony was limited to only his admitting to a prior conviction. There is no indication that the admission of this prior conviction years earlier had any bearing on the jury's decision. Furthermore, to prevent this line of questioning, the defendant's only option would have been not to testify. In light of the overwhelming evidence against him, there is no indication that the outcome would have been different had the defendant not chosen to testify.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] During the trial, several witnesses referred to Jones as "Zeke," "Cool Pack," "Cool Pop," "Charmane," and "Tupac." In this opinion, he will be referred to as "Jones."
[2] There is some confusion as to whether she saw Ms. Greely on the first or second trip to the vicinity of the Hyde Food Store.
[3] The suspicious stain turned out to be from a Coke that had been spewed onto the glass, leaving a brown syrupy film. No blood evidence was found in the van.
[4] The gun was found at that location about a month later, after the water had receded. The gun's grips were held together by black tape.
[5] The victim's clothing was contained in an evidence bag received back from the pathologist from Jackson, Mississippi, while the clothing found at the defendant's employment was contained in a separate evidence bag stored in a different place.
[6] At the conclusion of this testimony, the defendant stipulated that the RG revolver in evidence fired the bullets that killed Jones.
[7] An allele is one of two alternative forms of a gene having the same place on homologous chromosomes.
[8] The trial court had previously ruled outside the presence of the jury that this statement was a "classic declaration against interest" and would be admissible.
[9] When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La. 1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La. 10/17/97), 701 So.2d 1333.

The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La. 1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747. This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La. 11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
[10] Appellate courts have generally held that as a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La.App.2d Cir.6/21/00), 764 So.2d 1164. But, in this case, the defendant argues that there is sufficient record to determine whether his trial counsel was ineffective.

When the record is sufficient, this court may resolve this issue on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673; State v. Smith, 25841 (La.App.2d Cir.2/23/94), 632 So.2d 887.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir. 1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra; State v. Roland, 36,786 (La.App.2d Cir.6/5/03), 850 So.2d 738; State v. Moore, 575 So.2d 928 (La.App. 2d Cir.1991). The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. Roland, supra; Moore, supra.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland, supra, at 2064. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Roland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174, writ denied, 95-1398 (La. 11/3/95), 662 So.2d 9.
A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland v. Washington, supra; State v. Jordan, 35,643 (La. App.2d Cir.4/3/02), 813 So.2d 1123, writ denied, XXXX-XXXX (La.5/30/03), 845 So.2d 1067.